KENJI M. PRICE #10523
United States Attorney
District of Hawaii



MICAH SMITH
Assistant U.S. Attorney
Room 6-100, PJKK Federal Bldg.
300 Ala Moana Boulevard
Honolulu, Hawaii   96850
Telephone:  (808) 541-2850
Facsimile:  (808) 541-2958
Email:  micah.smith@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, | MAG. NO. 20-01040 RT |
| Plaintiff, | CRIMINAL COMPLAINT; AFFIDAVIT IN SUPPORT OF |
| v. | CRIMINAL COMPLAINT |
| MAKOA K.F. WILSON, | |
| Defendant. | |

## **CRIMINAL COMPLAINT**

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

<u>Count 1</u>
Attempted Hobbs Act Robbery
(18 U.S.C. §§ 1951 and 2)

On or about May 4, 2018, within the District of Hawaii, MAKOA K.F. WILSON, the defendant, did knowingly and intentionally obstruct, delay and affect, and attempt to obstruct, delay and affect, commerce as that term is defined in Title 18, United States Code, Section 1951, and the movement of articles and commodities in such commerce, by robbery as that term is defined in Title 18, United States Code, Section 1951(b)(1), in that WILSON did attempt to unlawfully take and obtain personal property, that is, United States currency and other items, from the persons and in the presence of employees of a gambling establishment located on King Street, Honolulu, Hawaii (the "Zippy's Game Room"), against the employees' will by means of actual and threatened force, violence, and fear of injury, immediate and future, to the employees' persons, that is, WILSON and others attempted to commit a gunpoint robbery of employees of the Zippy's Game Room.

All in violation of Title 18, United States Code, Sections 1951 and 2.

2

<u>Count 2</u>
Firearm Offense
(18 U.S.C. §§ 924(c)(1)(A)(iii) and 2)

On or about May 4, 2018, within the District of Hawaii, MAKOA K.F. WILSON, the defendant, did knowingly use and carry a firearm, and did aid and abet the use and carry of a firearm, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, the attempted Hobbs Act robbery alleged in Count 1 of this Criminal Complaint, one of which firearms was discharged.

All in violation of Title 18, United States Code, Sections 924(c)(1)(A)(iii) and 2.

<u>Count 3</u>
Hobbs Act Robbery
(18 U.S.C. §§ 1951 and 2)

On or about July 15, 2020, within the District of Hawaii, MAKOA K.F. WILSON, the defendant, did knowingly and intentionally obstruct, delay and affect, and attempt to obstruct, delay and affect, commerce as that term is defined in Title 18, United States Code, Section 1951, and the movement of articles and commodities in such commerce, by robbery as that term is defined in Title 18, United States Code, Section 1951(b)(1), in that WILSON did unlawfully take and obtain personal property, that is, United States currency and other items, from the persons and in the presence of employees of a gambling establishment located on

3

Keaulana Avenue, Kapolei, Hawaii (the "Mermaid's Game Room"), against the employees' will by means of actual and threatened force, violence, and fear of injury, immediate and future, to the employees' persons, that is, WILSON and others committed a gunpoint robbery of employees of the Mermaid's Game Room.

All in violation of Title 18, United States Code, Sections 1951 and 2.

Count 4
Firearm Offense
(18 U.S.C. § 924(c)(1)(A)(ii))

On or about May 4, 2018, within the District of Hawaii, MAKOA K.F. WILSON, the defendant, did knowingly use and carry a firearm during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, the Hobbs Act robbery alleged in Count 3 of this Criminal Complaint, which firearm was brandished.

All in violation of Title 18, United States Code, Section 924(c)(1)(A)(ii).

//

//

//

//

//

//

//

4

I further state that I am a Task Force Officer with the Homeland Security Investigations ("HSI"), and that this Complaint is based upon the facts set forth in the attached "Affidavit in Support of Criminal Complaint," which is incorporated herein by reference.

DATED:  August 17, 2020, at Honolulu, Hawaii.

DOUGLAS LEE
Task Force Officer, HSI

This Criminal Complaint and Affidavit in support thereof were presented to, approved by, and probable cause to believe that the defendant above-named committed the charged crime found to exist by the undersigned Judicial Officer at _____ 4:03 p .m. on August 17, 2020.

Sworn to under oath before me telephonically, and attestation acknowledged pursuant to Federal Rule of Criminal Procedure 4.1(b)(2), on this 17th day of August, 2020, at Honolulu, Hawaii.



Rom A. Trader
United States Magistrate Judge

5

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

DOUGLAS LEE, being duly sworn, deposes and states as follows:

1.     I am a Task Force Officer with Homeland Security Investigations ("HSI") and also a Detective with the Honolulu Police Department ("HPD").

2.     The information contained in this affidavit is based on my personal knowledge, my training and experience, the corporate knowledge of other law enforcement personnel, and witness' statements.  This affidavit is intended merely to show there is probable cause for the requested Criminal Complaint and arrest warrant and does not set forth all of my knowledge about this matter.

## BACKGROUND ON ILLEGAL GAME ROOMS IN HAWAII

3.     Hawaii State Law prohibits certain forms of gambling activity.  For example, Hawaii Revised Statutes § 712-1222 makes it a crime to "knowingly advance or profit from gambling activity."  Under Hawaii State law, as relevant here, a person "engages in gambling if he stakes or risks something of value upon the outcome of a contest of chance …, upon an agreement or understanding that he or someone else will receive something of value in the event of a certain outcome."  Hawaii Revised Statutes § 712-1220(4).  A "contest of chance" is defined by Hawaii State law to include "any contest, game, gaming scheme, or gaming device in which the outcome depends in a material degree upon an element of chance,

notwithstanding that skill of the contestants may also be a factor therein." Hawaii Revised Statutes § 712-1220(3).

4.     I have been involved in the investigation of illegal game rooms in Hawaii. Among other things, I participated in the investigation of two illegal game rooms that operated out of residential single family homes, which resulted in federal charges against a total of twelve defendants in *United States v. Ding* et al., Crim. No. 19-00120-LEK, and *United States v. Ishizuka* et al., Crim. No. 19-00119-JMS. I have also accompanied HPD officers during the execution of numerous state search warrants at game rooms on Oahu. From my work investigating illegal game rooms in Hawaii, and from my training and experience, I have learned the following:

a.     Illegal game rooms in Hawaii commonly have "Fish Hunter" and "Pot-of-Gold" type gaming machines, which qualify as gambling devices under Hawaii state law because there is a material element of chance on the outcome of wagers made on these machines. For example, the illegal game rooms at issue in the *Ding* and *Ishizuka* cases used both Fish Hunter and Pot-of-Gold type gaming machines.

b.     Illegal game rooms in Hawaii typically employ security staff and cashiers. The security staff typically is responsible for monitoring the entry and exit of patrons, often through the use of video surveillance systems. The

2

cashiers are responsible for providing cash payouts to patrons who win on their

wagers.  Security staff and cashiers typically work in scheduled shifts.

        c.     Well-established illegal game rooms can generate substantial

amounts of cash.  For example, in the *Ding* and *Ishizuka* matters, law enforcement

determined that each game room generated several hundreds of thousands of

dollars in net profits over a period of a year.

        d.     Given the illegal nature of the businesses, game rooms are often

targeted for robberies in part because of the belief that the security staff, cashiers,

and patrons will be less likely to call or cooperate with the police.

## OVERVIEW OF THE CHARGES

5.     As described below, there is probable cause to conclude that Makoa

K.F. Wilson (hereinafter "WILSON"), the defendant, attempted to rob an illegal

game room on May 4, 2018 (Count 1), and did rob a second illegal game room of

approximately $4,000 on July 15, 2020 (Count 2).  WILSON was accompanied by

an accomplice during each of these violent crimes.  Neither of WILSON's

accomplices is charged in the accompanying Criminal Complaint.

6.     As described below, there also is probable cause to conclude that

WILSON used and carried a firearm during his commission of each of these

violent crimes.  During the attempted robbery on May 4, 2018, WILSON's

accomplice also had a firearm and discharged it (Count 2).  During the robbery on July 15, 2020, WILSON brandished his own firearm (Count 4).

## COUNTS 1 & 2:  THE MAY 4, 2018 ATTEMPTED ROBBERY

### Background on the Zippy's Game Room

7.      From my review of HPD reports and conversations with other law enforcement agents, I have learned the following, in substance and in part:

a.      The Miss Hawaii Building is a two-story commercial building consisting of three separate legitimate retail establishments, each with different addresses.  At a precise date unknown, but by at least May 2018, there was also an illegal gambling establishment located in this building.  The game room contained numerous Fish Hunter and Pot-of-Gold type gaming machines.  Based on several witness' statements, this game room was commonly referred to by patrons as the "Zippy's Game Room" (hereinafter the "Zippy's Game Room"), based on it being located across the street from the Zippy's restaurant on South King Street, Honolulu, Hawaii.

b.      The Zippy's Game Room occupied the second level of the Miss Hawaii Building.  Entrance to the game room was accessible via a ground floor door which opened onto South King Street.  Just inside the door was a set of stairs leading to the second floor.  At the top of the stairs was a small landing and a locked, white, metal security screen door.

c.      The game room was equipped with a CCTV video surveillance system with numerous cameras mounted at various locations inside and outside the game room.  These cameras recorded the events that occurred on property and saved the footage onto a Digital Video Recorder (DVR), which could be downloaded for future viewing.  The surveillance system monitored the building's stairwell area, the second floor landing, the white metal security door, the building's parking lot area, and the interior of the game room.

d.      In order to gain access to the game room, a patron needed to press the doorbell mounted on the door jam, which alerted the security personnel inside the game room.  The security employee monitored who was requesting entry by checking the security monitor inside the game room.

e.      If entry was to be permitted, the security personnel unlocked the door electronically by way of a "buzzer."  Access could be denied simply by refusing to unlock the door.  The security door led to a second level hallway area, which led to the game room.

f.      A parking lot located on the north side of the building contained numerous marked parking stalls for patrons of the businesses.  The parking area was about twenty feet away from the stairwell door and easily accessible via the sidewalk that traverses along Pawa'a Lane.

## <u>The Attempted Robbery of the Zippy's Game Room</u>

8.      From my review of HPD reports of interviews with witnesses, I have

learned the following, in substance and in part:

a.      On May 4, 2018, WITNESS-1 was employed by the Zippy's

Game Room to provide security.  Part of WITNESS-1's job was to ensure a safe

environment for the patrons within the game room and to monitor the video

surveillance cameras.  WITNESS-1 operated at the designated security area located

inside the game room.  WITNESS-1 was responsible for "buzzing-in" patrons who

wanted to enter, and for safety purposes, had discretion as to who entered the game

room.

b.      On May 4, 2018, at about 5:28 a.m., WITNESS-1 was on duty

monitoring the Zippy's Game Room video surveillance cameras when he observed

two unknown males standing in front of the security door on the second floor

landing.  WITNESS-1 observed the first male (hereinafter "SUSPECT-1") produce

a shotgun from under the right side of a vest he was wearing and fire a single round

at the metal security door's exterior door lock.  WITNESS-1 observed the second

male (hereinafter "SUSPECT-2") unsuccessfully pull on the security door in an

attempt to open it.  WITNESS-1 then observed SUSPECT-1 fire a second round at

the door lock and SUSPECT-2 make another unsuccessful attempt to open the

door.  After failing to gain entrance into the game room, both males ran down the

stairs and out to the building's parking lot where they entered a Chevrolet Blazer Sport Utility Vehicle (hereinafter "SUV"), and fled the scene.

c.      On May 4, 2018, at about 5:30 a.m., WITNESS-2 had just exited the McCully Zippy's restaurant when she heard two gunshots coming from the building across the street, and saw two males with rifles running down the stairwell of the building.  The males entered an SUV waiting at the side of the building, and fled westbound on Young Street.  WITNESS-2 did not get a good look at either of the males' faces.

d.      WITNESS-3 identified himself to the investigating officers as the Zippy's Game Room cashier.  He related that on May 4, 2018, at about 5:30 a.m., while watching the game room video surveillance system, he observed two unidentified males standing by the front entrance door of the game room. WITNESS-3 saw one of the males fire two shotgun rounds at the door, but the door failed to open.  Per WITNESS-3, the males fled on foot to an SUV that was parked in the parking lot at the rear of the building.

e.      WITNESS-4, related that on May 4, 2018, she was at the Zippy's Game Room and witnessed this incident via the game room surveillance system.  WITNESS-4 observed two males exit an SUV parked in the building's parking lot area, and attempt to gain entry into the game room.  WITNESS-4

7

observed one of the males shoot the game room security door two or three times with a gun, then both males fled the area in the SUV.

9.      From my review of HPD reports and conversations with other law enforcement agents, I have learned the following, in substance and in part:

a.      On May 4, 2018, at about 5:39 a.m., HPD Officer Justin T. TANIGAWA (hereinafter "Officer TANIGAWA") responded to the scene and observed damages to the second floor security door and the wall.  The damages were consistent with a shotgun blast.  Officer TANIGAWA entered the game room and discovered five Fish Hunter type machines, and eight Pot-of-Gold machines.

b.      On May 4, 2018, at about 5:33 a.m., HPD Officer Rhomnick J.B. VILLA (hereinafter "Officer VILLA") responded to the scene and met with WITNESS-2.  While speaking with WITNESS-2, Officer VILLA observed a male run down the building's stairwell and shut the stairwell door from the inside. Officer VILLA conducted a check of the building and met with WITNESS-1.  For officer safety reasons, Officer VILLA conducted an inspectional check of the game room and did not observe any weapons or injuries.  While conducting his checks, Officer VILLA observed arcade games and a video surveillance system consistent with those commonly utilized by illegal gambling establishments.

c.      On May 4, 2018, at about 7:15 a.m., HPD Officer Robert CHANG (hereinafter "Officer CHANG") and HPD Sergeant Kelly YAMAUCHI

responded to the scene, recovered the video surveillance footage, and submitted it
into HPD evidence.  While at the game room, Officer CHANG verified that the
DVR he retrieved the video surveillance footage from was a Samsung brand,
model number SDR-B74301, with an IP address of 192.168.1.100,l and a system
firmware version of V7.1.0-20170330 (hereinafter "Samsung DVR").

**The Surveillance Footage from the Zippy's Game Room**

10.     Your affiant reviewed the Zippy's Game Room video surveillance
footage that was released by WITNESS-3.  WITNESS-3 stated the video
surveillance system was in good working order during the dates and times of this
incident, and the recorded video depicts the true and accurate events that occurred
on the property.  The following was observed on the captured video footage:

Channel 1

05:21:39-   an SUV traveled south on Pawa'a Lane, turned right into the
            building's parking lot area, and parked in a designated handicap
            stall fronting Pawa'a Lane.

05:22:35-   the SUV reversed and drove forward toward Pawa'a Lane and
            out of camera view.

05:29:42-   the SUV drove north on Pawa'a Lane, past the building's parking
            lot area, and out of camera view.

<u>Channel 7</u>

05:22:50-  the SUV reversed into a stall in the building's parking lot area
and the headlights turned off.

05:28:09-  a male wearing blue jeans, a light colored long sleeved shirt, a
black colored vest and black colored baseball cap (hereinafter
"SUSPECT-1") exited the rear driver's side door of the SUV.  A
second male wearing black colored pants, a green colored T-shirt
and a green camouflage colored baseball cap (hereinafter
"SUSPECT-2") exited the front passenger's side seat of the SUV.

05:29:16-  the SUV headlights turn on.

05:29:33-  both suspects returned and re-entered the SUV via the same
doors from which they exited.

05:29:39-  the SUV turned left out of the parking lot area and drove north on
Pawa'a Lane and out of camera view.

<u>Channel 6</u>

05:28:46-  SUSPECT-1 and SUSPECT-2 entered the building's stairwell via
the South King Street door, and walked up the stairs, and stopped
fronting the game room metal security door.  SUSPECT-1
produced a black colored shotgun from under the right side of his
vest area.  SUSPECT-2 was holding a black colored backpack,

and had his right hand partially inserted into the main zippered compartment.  The video showed that SUSPECT-2 appeared to be holding a silver-metallic handgun in his right hand.  The gun was visible because it was partially protruding from the zippered compartment.

05:29:05-  SUSPECT-2 attempted to open the security door but was unsuccessful.  SUSPECT-1 racked the shotgun and fired a single round at the exterior door lock of the security door while SUSPECT-2 attempted to cover his ears.  SUSPECT-2 unsuccessfully attempted to open the security door a second time.  SUSPECT-1 racked the shotgun again and fired a second round at the exterior door lock.

05:29:21-  SUSPECT-2 unsuccessfully attempted to open the security door a third time.  Both suspects then fled down the stairwell.  During his flight, SUSPECT-2 dropped a black colored backpack on the ground at the bottom of the stairwell.

05:33:41-  a male wearing black colored pants, a grey colored shirt and a red colored baseball cap exited the security door, walked down the stairwell, and closed the door leading to South King Street.

05:34:06-   a female wearing a green colored shirt exited the security door
and watched as the as the male retrieved the backpack at the
bottom of the stairwell, as well as a spent shotgun shell case from
the top step area of the stairwell.

05:34:19-   both the male and female re-entered the security door.

11.   HPD Police Evidence Specialist 3 Richard D. PERRON (hereinafter
"Specialist PERRON") responded to the scene and recovered numerous items and
submitted them into HPD evidence.  Among the items recovered by Specialist
PERRON were an expended shot gun shell case (12 gauge GA, Federal shot shell),
spent shotgun shell wads, partial pieces of shotgun shot cups, a facial mask (white,
red and black in color) and a black colored AKA SPORTS brand backpack.

## Identification of WILSON as Suspect-2

12.   The game room video surveillance footage depicting the two male
suspects in this case was disseminated to numerous officers in HPD in an attempt
to identify them.  The footage is of relatively high quality, and although both
SUSPECT-1 and SUSPECT-2 are wearing baseball caps, significant portions of
their faces are captured in the footage.  Here, for example, is a still shot from
Channel 6, showing SUSPECT-1 and SUSPECT-2 just before SUSPECT-1 fired a
gunshot at the door:



13.    HPD Officer Kaiminaauao MEAD (hereinafter "Officer MEAD")

positively identified SUSPECT-2—the individual in the green colored T-shirt and

a green camouflage colored baseball cap in the image above—as WILSON.

Officer MEAD also identified SUSPECT-1.  Officer MEAD has had multiple in-

person interactions with WILSON and is therefore very familiar with WILSON's

physical appearance and mannerisms.

## Interstate Commerce

14.    HPD Detective and HSI Task Force Officer Clint IGE spoke with an

individual ("EMPLOYEE-1") who is currently employed as a Supervisor for the

Wisenet Life (hereinafter "Wisenet") Support Center.  Wisenet is a company that

manufactures security systems and maintains IP server systems for a Korean based

company called Hanwha Techwin, which in turn, is a sister company to Samsung. EMPLOYEE-1 confirmed that the Samsung DVR recovered from within the game room was not manufactured in the State of Hawaii.  In light of that determination, the Samsung DVR must have traveled in interstate or foreign commerce prior to being possessed in Hawaii.  Accordingly, in the course of its normal operations, the Zippy's Game Room employed an item manufactured out of state, namely, the Samsung DVR.  Moreover, given that the Samsung DVR was integral to its business functions, the Zippy's Game Room also would have needed to regularly replace that Samsung DVR.

15.    Furthermore, based on my participation in investigations of illegal game rooms, and my training and experience, I know that at least some of the component parts used in Fish Hunter and Pot-of-Gold machines are not manufactured in the State of Hawaii.  Illegal game rooms must periodically replace these machines, not only because of ordinary wear and tear, but also because state law enforcement authorities regularly execute state search warrants at illegal game rooms and seize these machines.

16.    For these reasons, there is probable cause that an attempted robbery of the Zippy's Game Room would have the potential to affect interstate commerce. *See* Ninth Circuit Manual of Model Criminal Jury Instructions, Comment to Instruction ¶ 8.143A Hobbs Act—Robbery or Attempted Robbery (18 U.S.C.

§ 1951) ("Only a de minimis effect on interstate commerce is required to establish jurisdiction under the Hobbs Act, and the effect need only be probable or potential, not actual." (citing *United States v. Lynch*, 437 F.3d 902, 908-09 (9th Cir. 2006) (en banc))).

## COUNTS 3 & 4:  THE JULY 15, 2020 ROBBERY

### Background on the Mermaid Caves Game Room

17.    From my review of HPD reports and conversations with other law enforcement agents, I have learned the following, in substance and in part:

a.    At a precise date unknown, but by at least in or about early April 2020, and up until at least in or about July 2020, an illegal gambling establishment was operating in a single story residence on Keaulana Avenue, Kapolei, Hawaii (hereinafter the "Mermaid's Game Room").  The Mermaid's Game Room, named as such due to its close geographical proximity to a coastline feature commonly referred to as "Mermaid Caves," was located in the front residence of a two-residence property.   According to confidential sources, the Mermaid's Game Room had recently changed operators and re-opened under new management on July 13, 2020.

b.    The property on Keaulana Avenue is an approximate half-acre residential lot located on the ocean side of Keaulana Avenue.  The Mermaid's Game Room was located in the first of two houses located on the property.

15

   c. Located at the front porch area of the front house was a locked wooden door.  Just to the right of the doorknob was a white button, similar to a doorbell, secured to the door frame.  To enter the Mermaid's Game Room, a patron needed to press the button and wait for the door to be manually unlocked from the inside by the on-duty security personnel.  The security personnel monitored the CCTV cameras mounted above the door to determine who was attempting to gain access to the game room.

   d. A second door was located just inside the first door.  This door also required the security personnel to manually unlock it.  Once past the second door, patrons found themselves in a video machine gambling room consisting of ten Fish Hunter type machines, and three Pot-of-Gold table-top machines.  Just to the right of the door was a table with chairs, and a large flat screen television.  This area was identified as the security area.

   e. The game room took up almost the entire interior of the house, including the living room, the kitchen, and one of the back bedrooms.  Off to the right side of the living room was another room with a metal security door; this room was identified as the cashier's office, and the door to it was locked and unlocked by key held by the cashier.

   f. The Mermaid's Game Room surveillance system included twelve SMONET brand digital video cameras situated around the exterior and

interior of the premises.  The cameras recorded digital video footage of the events occurring on the property and stored it onto a SMONET brand DVR, from which the footage could be downloaded and/or viewed at a future time.

18.    From my review of HPD reports and conversations with other law enforcement agents, I have learned, in substance and in part, that HPD had entered the Mermaid's Game Room on at least four occasions, as relevant here:

a.    On April 27, 2020, based on information provided by confidential sources, HPD officers conducted an inspection at the Mermaid's Game Room and found it to contain ten Fish Hunter type games and security cameras around the property.

b.    On May 24, 2020, HPD responded to a call of a robbery in progress at the Mermaid's Game Room.  Upon their arrival, they discovered uncooperative individuals there who denied any robbery had occurred.  Officers noted there was an illegal game room at that address.

c.    On June 19, 2020, a male wanted for an unrelated robbery that occurred nearby, was located and arrested in the Mermaid's Game Room.

d.    On July 15, 2020, an HPD officer received information from a confidential source regarding a gunpoint robbery of the Mermaid's Game Room, which is described in further detail below.

**<u>The Robbery of the Mermaid's Game Room</u>**

19.    From my conversations with Officer MEAD and my review of related HPD reports, I have learned, in substance and in part, the following:

a.    During the early morning hours of July 15, 2020, Officer MEAD received information from a cooperating source alleging the Mermaid's Game Room had just been robbed at gunpoint by WILSON and a female described as WILSON's girlfriend (hereinafter "SUSPECT-3").

b.    Officer MEAD has had prior contacts with WILSON and SUSPECT-3 and was very familiar with their physical appearances and mannerisms.

20.    From my conversations with Officer MEAD and my review of related HPD reports, I have learned, in substance and in part, that after receiving the information described in paragraph 18.d. above, Officer MEAD responded to the Mermaid's Game Room and met with the security and the cashier (hereinafter "WITNESS-5" and "WITNESS-6," respectively), both of whom had been working during the robbery.  Officer MEAD obtained statements from both individuals who provided, in substance and in part, the following information:

a.    WITNESS-5 and WITNESS-6 stated they were employees of the establishment, and the establishment was a game room.  WITNESS-5 and WITNESS-6 related that on July 15, 2020, between 2:30 and 2:45 a.m., a male

patron and his female companion (later identified as WILSON and SUSPECT-3, as described below) were gambling on the Fish Hunter type video machines.  The couple had been playing in the Mermaid's Game Room for over an hour and a half.  At about that time, WITNESS-5 was lying down near the security table and WITNESS-6 was in the locked cashier's office when SUSPECT-3, who was sitting at one of the gambling machines, yelled, in substance and in part, "Cash out!"[1]

      b.      WITNESS-6 stated she exited the cashier's office to service SUSPECT-3's call when WILSON suddenly stepped out from behind the wall and approached WITNESS-6.  With his right hand, WILSON raised and pointed a handgun in WITNESS-6's direction and told her, in substance and in part, "Give me the fucking money!"

      c.      WITNESS-6 walked with WILSON back into the cashier's office and opened the desk drawer to give WILSON whatever cash was in there.  WITNESS-6 stated that there was only about fifty dollars in the drawer because she kept majority of the game room money in a bag secured to her body.  WITNESS-6 estimated there was over two thousand dollars in cash in her bag.

---

[1] It is common practice for patrons who have either won money on the machines or want to quit playing that particular machine to yell "cash out!" as a way of getting the attention of the on-duty cashier.  The cashier responds to the patron and takes note of the amount of digital credits displayed on the screen in front of the player.  The cashier then uses a key to manipulate the credits back down to zero, and pays the patron in cash equivalent to the digital credits that were displayed.  The machines register each credit point to have a $0.01 value.

After giving WILSON the cash from the drawer, WILSON yelled, in substance and in part, "Give me *all* the money!"

        d.      WITNESS-6 gave WILSON her bag containing the bulk of the game room's cash.  Unbeknownst to WILSON, the keys for the game machines were attached to the bag.  WILSON demanded the keys for the machines, to which WITNESS-6 pointed out he already possessed.

        e.      At about that time, SUSPECT-3 entered the cashier's office and took the game machine keys from WILSON.  SUSPECT-3 proceeded to use the keys to unlock the bottom compartments of the two Fish Hunter type machines closest to the main door.[2]

        f.      WILSON and WITNESS-6 exited the cashier's office.  WILSON then told WITNESS-5 and the other on-duty security guard to go and stand in the corner.  They both complied.

        g.      SUSPECT-3 proceeded to collect the cash from the two machines as WILSON stood by with WITNESS-6.  After collecting the cash, WILSON told WITNESS-5 to unlock the door.  WILSON and SUSPECT-3 then exited the game room and fled in a vehicle in an unknown direction.  WITNESS-6

---

[2]  The Fish Hunter type games consist of several player positions around the machine.  Each position has a corresponding bill acceptor into which a player inserts their cash wager.  The bill collector reads the bill's denomination, registers the credits, and drops the bill into the cabinet area of the machine where the all the bills are loosely kept.

estimated that WILSON and SUSPECT-3 took approximately $4,000 in cash from the Mermaid Game Room.

> h.    WITNESS-6 stated that at one point during the incident, she was afraid WILSON was going to shoot her.

## The Identification of WILSON and SUSPECT-3

21.    From my conversations with Officer MEAD and my review of related HPD reports, I have learned, in substance and in part, that during the interview, Officer Mead showed WITNESS-5 photographs of WILSON and SUSPECT-3. WITNESS-5 positively identified them both as the people who robbed the Mermaid's Game Room that morning.  WITNESS-5 further related he has known WILSON since they were kids and the two call each other by first name. WITNESS-5 has also known SUSPECT-3 for a while and knows her to be WILSON's girlfriend.

## The Further Investigation

22.    As a part of this investigation, WITNESS-6 turned over the SMONET brand DVR to Officer Mead as evidence; the DVR was subsequently submitted into the HPD Evidence Room.  WITNESS-6 attested that to the best of her knowledge, the DVR contained a true and accurate depiction of the individuals and events that occurred on July 15, 2020.

21

23.    Your affiant responded to the Mermaid's Game Room to further this investigation, and noted that the Fish Hunter machines throughout the Mermaid's Game Room utilized flat-screen television sets as computer game monitors.  The televisions used in the two Fish Hunter machines from which SUSPECT-3 removed the cash were both TCL brand televisions, model 55S423.  A VIZIO brand television, model VS55, was mounted at the security table and was used to monitor the security cameras.

24.    Your affiant contacted TCL Support Services and spoke with a Technical Support Agent who related that all TCL televisions, including Model 55S423, are manufactured in China, and that TCL does not manufacture any of their products in the State of Hawaii.  In addition, HPD Detective Clint Ige contacted the VIZIO Customer Support Center and spoke to a Level Three Customer Support Representative, who confirmed that VIZIO televisions are not manufactured in the State of Hawaii, but are commonly manufactured in China or Mexico.

25.    Your affiant prepared a federal search warrant seeking judicial approval to search the DVR recovered from the Mermaid's Game Room and submitted into HPD Evidence.  The search warrant was approved by the Honorable Kenneth J. Mansfield, United States Magistrate Judge for the District of Hawaii, on July 17, 2020.

26.     HPD Officer Patrick MATSUO executed the warrant on the DVR on July 29, 2020, recovered the digital footage stored on the DVR, and transferred a copy to an external drive which was subsequently submitted into HPD Evidence.

27.     Your affiant reviewed the video footage and found that it corroborated the statements given by WITNESS-5 and WITNESS-6.  However, it was noted that the time stamp did not correspond with the witnesses' account of the time of offense.  It appeared as if the time stamp on the video footage was mistakenly set approximately 18 hours ahead of the actual time. It was also noted that all twelve cameras appeared to be synchronized with each other.  The following relevant video footage was observed:

Camera 1:

18:19:37-  WILSON entered the game room wearing a white colored Nike brand hoodie, white shorts, white shoes with black socks, and a dark blue Atlanta Braves baseball cap.

18:21:30-  SUSPECT-3 entered the game room wearing a light blue jacket, a white tube-top, black pants, and was carrying a large red purse . Both SUSPECT-3 and WILSON proceeded to play on the Fish Hunter machines and conversed with the security.  Throughout the duration of their time in the game room, SUSPECT-3 and WILSON removed and put back on their outer garments.

20:35:49-   SUSPECT-3 and WILSON met in middle of the main room and
appeared to exchange words.  They both then separated;
SUSPECT-3 went to a game machine near the kitchen and
WILSON paced back and forth from the cashier's office to the
security area.

20:36:20-   WILSON reached into his right-front pocket of his shorts as he
walked toward the cashier's office and out of camera view.

20:36:38-   SUSPECT-3 and one of the security personnel walked toward the
cashier's office and out of camera view.

20:37:03-   SUSPECT-3 returned into camera view, went to the Fish
Machine near the entrance/exit door, unlocked the cabinet at the
bottom of the machine, and removed the money from within
while WILSON paced back and forth.  WILSON was shown on
video holding the brown colored bag he took from WITNESS-6.

20:38:35-   WITNESS-5 opened the door and let WILSON and SUSPECT-3
exit the game room.  Prior to leaving, SUSPECT-3 left a set of
keys on one of the Fish Machines.

Camera 2:

20:36:21-   WILSON approached WITNESS-6, who had just exited the
cashier's office, and removed a pistol from the right front pocket

of his shorts.  WILSON raised the weapon in WITNESS-6's direction, got to within arm's length of WITNESS-6, and appeared to be speaking to her.  WILSON then took possession of a bag from WITNESS-6.

20:36:29- WILSON and WITNESS-6 walked out of camera view toward the cashier's office.

20:36:42-  SUSPECT-3 and WITNESS-5 walked toward the cashier's office.

20:37:05- SUSPECT-3 started unlocking the Fish Machine near the door. WILSON paced around the game room, still carrying the bag he took from WITNESS-6.

20:38:35- WITNESS-5 opened the door and let WILSON and SUSPECT-3 out of the game room.  SUSPECT-3 left the keys on the Fish Machine prior to leaving.

Camera 3:

20:36:19- WITNESS-6 exited the cashier's office as WILSON approached her while removing an object from the right front pocked of his shorts.

20:36:26- WILSON took possession of the bag WITNESS-6 was wearing around her body.  Both of them then entered the cashier's office.

25

20:36:54-   SUSPECT-3 stepped into the cashier's office for a brief moment, and then walked directly to one of the Fish Machines where she proceeded to unlock the bottom cabinet and remove cash from within.

20:38:38-   WILSON and SUSPECT-3 exited the game room.

Camera 4:

20:38:38-   WITNESS-5 opened the game room doors to allow WILSON and SUSPECT-3 to exit.  WILSON was observed to still be in possession of the bag he took from WITNESS-6 as he exited the game room.

28.    Officer MEAD viewed the relevant portions of the surveillance videos and positively identified WILSON and SUSPECT-3 as the suspects in this case.

**The Effect on Interstate Commerce**

29.    As noted in paragraph 24 above, the TCL and VIZIO televisions were not manufactured in the State of Hawaii.  In light of that determination, the televisions must have traveled in interstate or foreign commerce prior to being possessed in Hawaii.  Accordingly, in the course of its normal operations, the Mermaid's Game Room employed items manufactured out of state, namely, the TCL and VIZIO televisions.  Moreover, given that these televisions were integral

to its business functions, the Mermaid's Game Room also would have needed to regularly replace these televisions.

30.    Furthermore, based on my participation in investigations of illegal game rooms, and my training and experience, I know that at least some of the component parts used in Fish Hunter and Pot-of-Gold machines are not manufactured in the State of Hawaii.  Illegal game rooms must periodically replace these machines, not only because of ordinary wear and tear, but also because state law enforcement authorities regularly execute state search warrants at illegal game rooms and seize these machines.

31.    For these reasons, there is probable cause that the robbery of the Mermaid's Game Room had the potential to affect interstate commerce.

## **CONCLUSION**

32.    Based on the foregoing facts, your affiant respectfully submits that probable cause exists to believe that (i) WILSON twice violated Title 18, United States Code, Section 1951 by attempting to rob the Zippy's Game Room on May 4, 2018, and by robbing the Mermaid's Game Room on July 15, 2020; and (ii) WILSON twice violated Title 18, United States Code, Section 924(c), by aiding and abetting the discharge of a firearm during the attempted robbery of the Zippy's

//

//

27

Game Room, and by brandishing his own firearm during the robbery of the

Mermaid's Game Room.

Respectfully submitted,

DOUGLAS LEE
Task Force Officer, HSI

This Criminal Complaint and Affidavit in support thereof were presented to,
approved by, and probable cause to believe that the defendant above-named
committed the charged crime found to exist by the undersigned Judicial Officer at
_____4:03 p___.m. on August 17, 2020.

Sworn to under oath before me telephonically, and attestation acknowledged
pursuant to Federal Rule of Criminal Procedure 4.1(b)(2), on this 17th day of
August, 2020, at Honolulu, Hawaii.

Rom A. Trader
United States Magistrate Judge