CLARE E. CONNORS #7936
United States Attorney
District of Hawaii

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
Mar 23, 2022, 8:42 am
Pam Hartman Beyer, Clerk of Court

MICHAEL NAMMAR
Chief, Criminal Division

MICAH SMITH
Assistant U.S. Attorney
Room 6100, PJKK Federal Building
300 Ala Moana Blvd.
Honolulu, Hawaii  96850
Telephone:  (808) 541-2850
Facsimile:   (808) 541-2958
Email:       Micah.Smith@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR. NO. 21-00119 SOM |
| Plaintiff, | MEMORANDUM OF PLEA AGREEMENT |
| vs. | DATE: |
| MAKOA K.F. WILSON, | TIME |
| Defendant. | JUDGE: |

## MEMORANDUM OF PLEA AGREEMENT

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the

UNITED STATES OF AMERICA, by its attorney, the United States Attorney for

the District of Hawaii, and the defendant, MAKOA K.F. WILSON, and his

attorney, John Schum, Esq., have agreed upon the following:

## THE CHARGES

1.     The defendant acknowledges that he has been charged in the

Indictment with violating Title 18, United States Code, Sections 1951 and 2 (Count

1); Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A) (Count 2);

Title 18, United States Code, Section 924(c)(1)(A)(i) (Count 3); and Title 18,

United States Code, Sections 922(g)(1) and 924(a)(2) (Count 4).

2.     The defendant has read the charges against him contained in the

Indictment, and those charges have been fully explained to him by his attorney.

3.     The defendant fully understands the nature and elements of the crimes

with which he has been charged.

## THE AGREEMENT

4.     The defendant will enter a voluntary plea of guilty to Count 1 of the

Indictment, which charges him with committing a Hobbs Act robbery of an illegal

game room establishment on or about July 15, 2020 (Count 1).   The defendant

also agrees to accept responsibility for the conduct underlying Counts 2, 3, and 4

of the Indictment, through the factual stipulations set forth in paragraphs 8.i.

through 8.m. below.   In return, the government agrees move to dismiss Counts 2,

2

3, and 4 of the Indictment as to the defendant after sentencing. The defendant understands and agrees, however, that the Court at sentencing may consider the conduct underlying Counts 2, 3, and 4, as set forth in paragraphs 8.i. through 8.m. below, as relevant to the sentencing factors set forth in Title 18, United States Code, Section 3553(a). The government also agrees, under Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, that it will not recommend a sentence of greater than 120 months' imprisonment at sentencing. The defendant understands and agrees, however, that the Probation Office and the Court are not bound by the government's recommendation. Moreover, both the defendant and the government remain free to argue at sentencing for a sentence of less than 120 months' imprisonment at sentence.

5.      The defendant agrees that this Memorandum of Plea Agreement shall be filed and become part of the record in this case.

6.      The defendant enters this plea because he is in fact guilty of committing a Hobbs Act robbery of an illegal game room establishment on or about July 15, 2020, as charged in Count 1 of the Indictment, and he agrees that this plea is voluntary and not the result of force or threats.

## PENALTIES

7.    The defendant understands that the penalties for the offense to which he is pleading guilty include:

a.    A term of imprisonment of up to 20 years and a fine of up to $250,000, plus a term of supervised release up to 3 years.

b.    In addition, the Court must impose a $100 special assessment as to each count to which the defendant is pleading guilty.   The defendant agrees to pay $100 for each count to which he is pleading guilty to the District Court's Clerk's Office, to be credited to said special assessments, before the commencement of any portion of sentencing.   The defendant acknowledges that failure to make such full advance payment in a form and manner acceptable to the prosecution will allow, though not require, the prosecution to withdraw from this Agreement at its option.

c.    **Forfeiture.**   Pursuant to 18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461, forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of a specified unlawful activity within the meaning of 18 U.S.C. § 1956(c)(7) or a conspiracy to commit such offense.

d.    **Restitution.**   The Court must also award restitution pursuant to Title 18, United States Code, Section 3663A, to the persons and entities victimized

4

by the defendant's offenses.   The defendant understands that the Court will determine the amounts of restitution to be ordered, as well as the persons and entities entitled to such restitution, with the assistance of the United States Probation Office.

## FACTUAL STIPULATIONS

8.    The defendant admits the following facts and agrees that they are not a detailed recitation, but merely an outline of what happened in relation to the charge to which the defendant is pleading guilty:

### The Hobbs Act Robbery

a.    Between 2:30 a.m. and 2:45 a.m. in the early morning hours of July 15, 2020, MAKOA K.F. WILSON, the defendant, and Jessica R. Lorrin, his co-defendant, robbed an illegal gambling establishment which at that time was operating out of a single-story residence on Keaulana Avenue, Kapolei, Hawaii (hereinafter the "Game Room").   The Game Room operated in violation of Hawaii state law, which makes it a crime to "knowingly advance or profit from gambling activity."   Hawaii Revised Statutes § 712-1222.

b.    WILSON and Lorrin initially arrived at the Game Room sometime shortly after midnight on July 15, 2020.   At that time, two individuals were working as security and one individual was working as a cashier (the

5

"Cashier"). There also were other patrons in the Game Room. The Game Room was equipped with surveillance cameras that recorded events inside and outside of the location and projected them onto a large, flat screen television in the Game Room's security area.

        c. When WILSON and Lorrin initially arrived, they gambled on the electronic gambling machines within the Game Room for over an hour and a half. At one point while they gambled, WILSON took off a white Nike hoodie sweater he was wearing, and Lorrin put it on instead. Then, at around 2:30 a.m., WILSON and Lorrin left the Game Room for about 10 to 15 minutes. They used that time to turn around the white GMC Yukon in which they had arrived at the Game Room, which has a "Murder" sticker on its rear windshield (the "GMC Yukon"), so that it would be pointing toward the exit road rather than toward the Game Room. WILSON also reclaimed his white Nike sweater from Lorrin.

        d. WILSON and Lorrin returned to the Game Room and briefly began playing on one of the electronic gambling machines again. At some point, WILSON walked toward the security staff area while Lorrin continued playing on an electronic gambling machine. The Cashier was in the cashier's office area of the Game Room and heard a female yell, "Cash out!" The Cashier came out of the cashier office and, as she did, WILSON came from behind a wall near the

6

security area and approached the Cashier.   With his right hand, WILSON raised

and displayed a black object in the Cashier's direction and told her, in substance,

"Give me the fucking money!"   The Cashier walked with WILSON back into the

cashier's office and opened the desk drawer to give WILSON whatever cash was

in there.   After giving WILSON the cash from the drawer, WILSON yelled, in

substance, "Give me *all* the money."   The Cashier then gave WILSON her bag

containing the bulk of the Game Room's cash, which she estimated was about

$2,000 in cash.

       e.     The bag also contained the keys for the gambling machines in

the Game Room, and at this point, Lorrin entered the cashier's office.   Lorrin

stated, in substance, "why is there so little money?"   Lorrin then took the keys

from WILSON and proceeded to use the keys to unlock the bottom compartments

of two of the electronic gambling machines closest to the main door.   WILSON

and the Cashier exited the cashier's office and WILSON ordered the two security

staffers to go stand in the corner.

       f.     Lorrin collected the cash from the two machines as WILSON

stood by with the Cashier.   Then, after collecting the cash, WILSON told one of

the security staff to unlock the entrance to the Game Room.   The security staff

member did so and WILSON and Lorrin exited the Game Room, entered into the

GMC Yukon that was parked nearby (and that was now conveniently facing the exit road), and drove away. The Cashier estimates that WILSON and Lorrin took approximately $4,000 in cash.

g. Through his threats of force during his commission of the robbery, WILSON placed the Cashier in fear of injury to her person.

h. The robbery of the Game Room that WILSON and Lorrin committed on July 15, 2020, affected interstate and foreign commerce because, in the course of its normal operations, the Game Room used items manufactured out of state, including television monitors that were not manufactured in Hawaii. Moreover, these televisions were integral to the Game Room's business functions, because they were used by security staff to monitor video surveillance footage within and outside the Game Room; accordingly, the Game Room would have needed to regularly replace these televisions. Furthermore, at least some of the component parts in the electronic gambling machines were not manufactured in Hawaii. The Game Room would have needed to periodically replace these machines, not only because of ordinary wear and tear, but also because state law enforcement authorities regularly execute state search warrants at illegal game rooms and seize these machines.

8

### The Firearm, Ammunition, and Methamphetamine

i.      A sealed federal criminal complaint was filed against WILSON on August 17, 2020, and a federal warrant was issued for his arrest.   The next day, on August 18, 2020, Honolulu Police Department ("HPD") personnel observed WILSON driving the GMC Yukon on Farrington Highway in the Nanakuli area of Oahu, with Lorrin in the front passenger seat.   HPD personnel observed the GMC Yukon drive into a yard off the highway that sells and fills propane.

j.      WILSON exited the vehicle and law enforcement approached and arrested him on the federal arrest warrant.   At that time, HPD personnel observed Lorrin lying down in the GMC Yukon with her head toward the driver's seat.   The officers instructed Lorrin to exit the vehicle.   Lorrin was observed hunched over the center console area leaning into the driver's seat area and furtively doing something with her hands below the steering wheel.   Then, Lorrin was observed attempting to reach over to a black bag that was under the driver's seat in the area where Lorrin had just been observed acting suspiciously under the steering wheel.   The officers instructed her not to do so, but Lorrin reached over and picked up the bag.   Lorrin eventually complied with the officers' commands and dropped the bag and exited the GMC Yukon.   Lorrin then became irate and

9

insisted on removing the bags in the vehicle, complaining verbally, "What the fuck, I need my shit.   You guys cannot take the car, it's not even Makoa's!" Lorrin then started yelling, "What is the warrant for, you guys cannot take the bags without the warrant.   I want to see it!"

        k.     HPD personnel secured the vehicle and towed it back to the Kapolei police precinct while a federal search warrant was obtained.   Upon execution of the search warrant, agents recovered, among other things, a 9mm Polymer80 Inc. Glock pistol with an extended clip and approximately 33 rounds of 9mm ammunition that were inside of a black bag that was resting on the driver's seat.   A Louis Vuitton purse was also inside of the larger black bag.   And inside of this Louis Vuitton purse, law enforcement agents recovered eight bags (five smaller bags and three larger bags) containing methamphetamine.   Lab testing of the five smaller bags revealed a total net weight of 17.71 grams of methamphetamine with a purity level of 98.1 percent (with a margin of error of 2.6 percent).   Lab testing of the three remaining bags revealed a total net weight of 83.64 grams of methamphetamine with a purity level of 99.1 percent (with a margin of error of 2.6 percent).   The total amount of methamphetamine recovered from the GMC Yukon was therefore over 100 grams of methamphetamine.

l.      Meanwhile, during the search of WILSON's person after his arrest, Task Force Officers with Homeland Security Investigations recovered two plastic baggies containing methamphetamine from his pocket.   Lab testing revealed that the methamphetamine had purity levels of 97.5 percent (with a margin of error of 2.5 percent) and 98.2 percent (with a margin of error of 2.6 percent) and had a weight of 2.38 grams and 2.67 grams, respectively—meaning that these bags contained roughly the same amount of methamphetamine as the five smaller bags of methamphetamine that had been recovered from the Louis Vuitton purse described above.   The Task Force Officers also recovered $1,360 in United States currency from a wallet that had been on WILSON's person.

m.      Prior to the time of WILSON's arrest on August 18, 2020, both WILSON and Lorrin had been convicted of at least one crime punishable by more than a year of imprisonment.

9.      Pursuant to CrimLR 32.1(a) of the Local Rules of the United States District Court for the District of Hawaii, the parties agree that the charge to which the defendant is pleading guilty adequately reflects the seriousness of the actual offense behavior and that accepting this Agreement will not undermine the statutory purposes of sentencing.

11

## SENTENCING STIPULATIONS

10.     Pursuant to CrimLR 32.1(b) of the Local Rules of the United States
District Court for the District of Hawaii and Section 6B1.4 of the Sentencing
Guidelines, the parties stipulate to the following for the purpose of the sentencing
of the defendant in connection with this matter:

a.     The government also agrees, under Rule 11(c)(1)(B) of the
Federal Rules of Criminal Procedure, that it will not recommend a sentence of
greater than 120 months' imprisonment at sentencing.   The defendant understands
and agrees, however, that the Probation Office and the Court are not bound by the
government's recommendation.   Moreover, both the defendant and the
government remain free to argue at sentencing for a sentence of less than 120
months' imprisonment at sentence.

b.     As of the date of this agreement, it is expected that the
defendant will enter a plea of guilty prior to the commencement of trial, will
truthfully admit his involvement in the offense and related conduct, and will not
engage in conduct that is inconsistent with such acceptance of responsibility.   If
all of these events occur, and the defendant's acceptance of responsibility
continues through the date of sentencing, a downward adjustment of 2 levels for

acceptance of responsibility will be appropriate.   *See* U.S.S.G. § 3E1.1(a) and Application Note 3.

        c.     The United States Attorney agrees that the defendant's agreement herein to enter into a guilty plea constitutes notice of intent to plead guilty in a timely manner, so as to permit the government to avoid preparing for trial as to the defendant.   Accordingly, the United States Attorney anticipates moving in the Government's Sentencing Statement for a one-level reduction in sentencing offense level pursuant to Guideline § 3E1.1(b), if the defendant is otherwise eligible.   The defendant understands that notwithstanding its present intentions, and still within the Agreement, the prosecution reserves the rights (1) to argue to the contrary in the event of receipt of new information relating to those issues, and (2) to call and examine witnesses on those issues in the event that either the United States Probation Office finds to the contrary of the prosecution's intentions or the Court requests that evidence be presented on those issues.

      11.    The parties agree that notwithstanding the parties' Agreement herein, the Court is not bound by any stipulation entered into by the parties but may, with the aid of the presentence report, determine the facts relevant to sentencing.   The parties understand that the Court's rejection of any stipulation between the parties

does not constitute a refusal to accept this Agreement since the Court is expressly not bound by stipulations between the parties.

12.     The parties represent that as of the date of this agreement there are no material facts in dispute.

## APPEAL/COLLATERAL REVIEW

13.     The defendant is aware that he has the right to appeal his conviction and the sentence imposed.   The defendant knowingly and voluntarily waives the right to appeal, except as indicated in subparagraph "b" below, his conviction and any sentence within the Guidelines range as determined by the Court at the time of sentencing, and any lawful restitution or forfeiture order imposed, or the manner in which the sentence, restitution, or forfeiture order was determined, on any ground whatsoever, in exchange for the concessions made by the prosecution in this Agreement.   The defendant understands that this waiver includes the right to assert any and all legally waivable claims.

a.     The defendant also waives the right to challenge his conviction or sentence or the manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under Title 28, United States Code, Section 2255, except that the defendant may make such a challenge (1) as

14

indicated in subparagraph "b" below, or (2) based on a claim of ineffective assistance of counsel.

        b.     If the Court imposes a sentence greater than specified in the guideline range determined by the Court to be applicable to the defendant, the defendant retains the right to appeal the portion of his sentence greater than specified in that guideline range and the manner in which that portion was determined and to challenge that portion of his sentence in a collateral attack.

        c.     The prosecution retains its right to appeal the sentence and the manner in which it was determined on any of the grounds stated in Title 18, United States Code, Section 3742(b).

## FINANCIAL DISCLOSURE

    14.    In connection with the collection of restitution or other financial obligations, including forfeiture as set forth below, that may be imposed upon him, the defendant agrees as follows:

        a.     The defendant agrees to fully disclose all assets in which he has any interest or over which he exercises control, directly or indirectly, including any assets held by a spouse, nominee, or third party. The defendant understands that the United States Probation Office (USPO) will conduct a presentence investigation that will require the defendant to complete a comprehensive financial

15

statement.   To avoid the requirement of the defendant completing financial

statements for both the USPO and the government, the defendant agrees to

truthfully complete a financial statement provided to the defendant by the United

States Attorney's Office.   The defendant agrees to complete the disclosure

statement and provide it to the USPO within the time frame required by the United

States Probation officer assigned to the defendant's case.   The defendant

understands that the USPO will in turn provide a copy of the completed financial

statement to the United States Attorney's Office.   The defendant agrees to provide

written updates to both the USPO and the United States Attorney's Office

regarding any material changes in circumstances, which occur prior to sentencing,

within seven days of the event giving rise to the changed circumstances.   The

defendant's failure to timely and accurately complete and sign the financial

statement, and any written update thereto, may, in addition to any other penalty or

remedy, constitute the defendant's failure to accept responsibility under U.S.S.G §

3E1.1.

> b. The defendant expressly authorizes the United States

Attorney's Office to obtain his credit report.   The defendant agrees to provide

waivers, consents, or releases requested by the United States Attorney's Office to

access records to verify the financial information, such releases to be valid for a

period extending 90 days after the date of sentencing. The defendant also authorizes the United States Attorney's Office to inspect and copy all financial documents and information held by the USPO.

c. Prior to sentencing, the defendant agrees to notify the Financial Litigation Unit of the U.S. Attorney's Office before making any transfer of an interest in property with a value exceeding $1,000 owned directly or indirectly, individually or jointly, by the defendant, including any interest held or owned under any name, including trusts, partnerships, and corporations.

## **FORFEITURE**

15. As part of his acceptance of responsibility and pursuant to 18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461, the defendant agrees as follows:

a. (1) The defendant consents to the entry of a forfeiture money judgment in the amount of $2,640 in United States currency (the "Forfeiture Money Judgment"); (2) the defendant will forfeit all of his right, title, and interest in the $1,360 in United States currency recovered from his wallet upon his arrest on August 18, 2020 (the "Cash Specific Property"); and (3) the defendant will forfeit all of his right, title, and interest in the following property (the "Firearm Specific Property"):

17

        i.     the 9mm Polymer80, Inc. Glock pistol recovered from the GMC Yukon on August 18, 2020; and

        ii.     the 33 rounds of 9mm ammunition recovered from the GMC Yukon on August 18, 2020.

      b.     The defendant acknowledges that the Forfeiture Money Judgment and the Cash Specific Property are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461 as property, real or personal, which constitutes or is derived from proceeds traceable to a violation of a specified unlawful activity within the meaning of 18 U.S.C. § 1956(c)(7) or a conspiracy to commit such offense. The defendant further acknowledges that the Firearm Specific Property is subject to forfeiture pursuant to 18 U.S.C. § 924(d).

      c.     The defendant knowingly and voluntarily waives and agrees to waive any and all constitutional, statutory, and other challenges to the forfeiture on any and all grounds, including that the forfeiture constitutes an excessive fine or punishment under the Eighth Amendment. The defendant waives all constitutional, legal, and equitable defenses to the entry of and collection of the Forfeiture Money Judgment. The defendant knowingly and voluntarily waives any right to a jury trial on the forfeiture of property.

d. The defendant agrees to waive all interest in the Cash Specific Property and the Firearm Specific Property in any administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal, and to withdraw any claim that the defendant may have filed in such a proceeding. The defendant further waives any other notice requirement that may apply to the administrative and/or civil forfeiture of the Cash Specific Property and/or Firearm Specific Property. The defendant acknowledges that, on or about October 22, 2021, the Firearm Specific Property was administratively forfeited to the United States. The defendant consents to such forfeiture.

e. The defendant understands that the forfeiture of the forfeitable property does not constitute and will not be treated as satisfaction, in whole or in part, of any fine, restitution, reimbursement of cost of imprisonment, or any other monetary penalty this Court may impose upon the defendant in addition to the forfeiture. The Cash Specific Property will not be applied to the Forfeiture Money Judgment to satisfy that judgment. The defendant admits and agrees that a total of $4,000 was taken from the Game Room during the July 15, 2020, robbery; that the Cash Specific Property is the portion of that $4,000 that has been recovered by law enforcement; and that the Forfeiture Money Judgment amount, $2,640, represents

19

the remainder of the proceeds of the robbery that have not been recovered by law enforcement.

        f.      The defendant represents and agrees that, within the meaning of 21 U.S.C. § 853(p), the Forfeiture Money Judgment amount, $2,640, represents property subject to forfeiture that, as a result of any act or omission of the defendant,

        (A) cannot be located upon the exercise of due diligence;

        (B) has been transferred or sold to, or deposited with, a third party;

        (C) has been placed beyond the jurisdiction of the court;

        (D) has been substantially diminished in value; or

        (E) has been commingled with other property which cannot be divided without difficulty.

        g.      Payment of the Forfeiture Money Judgment shall be made by postal money order, bank check, or certified check payable to the Customs and Border Protection.   On or before the date he enters her plea of guilty pursuant to this agreement, the defendant shall cause said check to be hand-delivered to the Asset Forfeiture Unit, United States Attorney's Office, District of Hawaii, PJKK Federal Building, 300 Ala Moana Boulevard, Room 6-100, Honolulu, Hawaii 96850, with the criminal docket number noted on the face of the check.

h.      If the Forfeiture Money Judgment is not paid on or before the

date the defendant enters his plea of guilty pursuant to this agreement, interest shall

accrue at the judgment rate of interest (as defined by 28 U.S.C. § 1961) on any

unpaid portion thereof at the judgment rate of interest from that date.

Furthermore, if the defendant fails to pay any portion of the Forfeiture Money

Judgment on or before the date of his guilty plea, the defendant consents to the

forfeiture of any other property alleged to be subject to forfeiture in the Indictment,

including substitute assets, in full or partial satisfaction of the money judgment,

and remains responsible for the payment of any deficiency until the Forfeiture

Money Judgment, including any accrued interest, is paid in full.

## IMPOSITION OF SENTENCE

16.     The defendant understands that the District Court in imposing

sentence will consider the provisions of the Sentencing Guidelines.   The defendant

agrees that there is no promise or guarantee of the applicability or non-applicability

of any Guideline or any portion thereof, notwithstanding any representations or

predictions from any source.

17.     The defendant understands that this Agreement will not be accepted or

rejected by the Court until there has been an opportunity by the Court to consider a

presentence report, unless the Court decides that a presentence report is

21

unnecessary.   The defendant understands that the Court will not accept an

agreement unless the Court determines that the remaining charge adequately

reflects the seriousness of the actual offense behavior and accepting the Agreement

will not undermine the statutory purposes of sentencing.

## **WAIVER OF TRIAL RIGHTS**

18.   The defendant understands that by pleading guilty he surrenders

certain rights, including the following:

a.   If the defendant persisted in a plea of not guilty to the charges

against him, then he would have the right to a public and speedy trial.   The trial

could be either a jury trial or a trial by a judge sitting without a jury.   The

defendant has a right to a jury trial.   However, in order that the trial be conducted

by the judge sitting without a jury, the defendant, the prosecution, and the judge all

must agree that the trial be conducted by the judge without a jury.

b.   If the trial is a jury trial, the jury would be composed of twelve

laypersons selected at random.   The defendant and his attorney would have a say

in who the jurors would be by removing prospective jurors for cause where actual

bias or other disqualification is shown, or without cause by exercising peremptory

challenges.   The jury would have to agree unanimously before it could return a

verdict of either guilty or not guilty.   The jury would be instructed that the

22

defendant is presumed innocent, and that it could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt.

c.   If the trial is held by a judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not he or she was persuaded of the defendant's guilt beyond a reasonable doubt.

d.   At a trial, whether by a jury or a judge, the prosecution would be required to present its witnesses and other evidence against the defendant. The defendant would be able to confront those prosecution witnesses and his attorney would be able to cross-examine them. In turn, the defendant could present witnesses and other evidence on his own behalf. If the witnesses for the defendant would not appear voluntarily, the defendant could require their attendance through the subpoena power of the Court.

e.   At a trial, the defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify.

19.   The defendant understands that by pleading guilty, he is waiving all of the rights set forth in the preceding paragraph. The defendant's attorney has explained those rights to him, and the consequences of the waiver of those rights.

23

## USE OF PLEA STATEMENTS

20.    If, after signing this Agreement, the defendant decides not to plead

guilty as provided herein, or if the defendant pleads guilty but subsequently makes

a motion before the Court to withdraw his guilty plea and the Court grants that

motion, the defendant agrees that any admission of guilt that he makes by signing

this Agreement or that he makes while pleading guilty as set forth in this

Agreement may be used against him in a subsequent trial if the defendant later

proceeds to trial.   The defendant voluntarily, knowingly, and intelligently waives

any protection afforded by Rule 11(f) of the Federal Rules of Criminal Procedure

and Rule 410 of the Federal Rules of Evidence regarding the use of statements

made in this Agreement or during the course of pleading guilty when the guilty

plea is later withdrawn.   The *only* exception to this paragraph is where the

defendant fully complies with this Agreement but the Court nonetheless rejects it.

Under those circumstances, the United States may not use those statements of the

defendant for any purpose.

21.    The defendant understands that the prosecution will apprise the Court

and the United States Probation Office of the nature, scope and extent of the

defendant's conduct regarding the charges against him, related matters, and any

matters in aggravation or mitigation relevant to the issues involved in sentencing.

24

22.     The defendant and his attorney acknowledge that, apart from any written proffer agreements, if applicable, no threats, promises, agreements or conditions have been entered into by the parties other than those set forth in this Agreement, to induce the defendant to plead guilty.   Apart from any written proffer agreements, if applicable, this Agreement supersedes all prior promises, agreements or conditions between the parties.

23.     To become effective, this Agreement must be signed by all signatories listed below.

//

//

//

//

//

25

24.     Should the Court refuse to accept this Agreement, it is null and void

and neither party shall be bound thereto.

AGREED:

CLARE E. CONNORS
United States Attorney
District of Hawaii

_____           Dated: _____3/22/2022_____

MICHAEL NAMMAR
Chief, Criminal Division

_____           Dated: _____3/22/2022_____

MICAH SMITH
Assistant U.S. Attorney

_____           Dated: _____3/22/2022_____

MAKOA K.F. WILSON
Defendant

_____           Dated: _____3/22/2022_____

JOHN SCHUM
Attorney for Defendant

26